UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| ROMIKA PAHALAD, | Case No. 18-cv-06122-LB |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | Re: ECF Nos. 18 & 19 |

## INTRODUCTION

The plaintiff Romika Pahalad seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for disability benefits under Title II of the Social Security Act ("SSA").[1] She moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to magistrate-judge jurisdiction.[4] The court grants the plaintiff's motion, denies the Commissioner's motion, and remands for further proceedings consistent with this order.

---

[1] Motion for Summary Judgment ("Mot.") – ECF No. 18. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 18-1 at 1.

[3] Cross Motion for Summary Judgment ("Cross Mot.") – ECF No. 19.

[4] Consent Forms – ECF Nos. 8, 10.

**STATEMENT**

**1. Procedural History**

On October 10, 2013, the plaintiff, then age 46, filed a claim for social-security disability insurance ("SSDI") benefits under Title II of the SSA.[5] She alleged the following impairments: a damaged right leg, arthritis in her knee, a back injury, a traumatic-brain injury, depression, chronic severe headaches, fatigue, and insomnia.[6] Her alleged onset date originally was October 1, 2012, but was amended to May 3, 2011 at the administrative hearing.[7] The Commissioner denied the plaintiff's SSDI claim initially and on reconsideration.[8] The plaintiff timely requested a hearing.[9]

On February 1, 2017, Administrative Law Judge David R. Mazzi (the "ALJ") held a hearing.[10] Attorney Harvey P. Sackett represented the plaintiff.[11] The ALJ heard testimony from the plaintiff and vocational expert ("VE") Joel M. Greenberg.[12] On September 15, 2017, the ALJ issued an unfavorable decision.[13] The plaintiff timely appealed the decision to the Appeals Council on November 1, 2017.[14] The Appeals Council denied her request for review on July 31, 2018.[15] On October 4, 2018, the plaintiff timely filed this action for judicial review and subsequently moved

---

[5] AR 56, 287. Administrative Record ("AR") citations refer to the page numbers in the bottom-right hand corner of the AR.

[6] These are the impairments that the plaintiff asserted in her initial Disability Determination Explanation. AR 56. In the plaintiff's memorandum to the ALJ, she asserted bilateral-knee osteoarthritis, lumbar-degenerative-disc-disease, and anxiety/depression. AR 287–91. The ALJ found that the plaintiff had the following severe impairments: "osteoarthritis of the knees, morbid obesity, opioid dependence, degenerative disc disease, and affective disorders with diagnosis including depression." AR 19. The plaintiff's motion alleges "osteoarthritis of both knees, morbid obesity, degenerative disc disease, and affective disorder." Mot. – ECF No. 18 at 8.

[7] AR 56; *see* AR 16, 52.

[8] AR 62, 76.

[9] AR 92–93.

[10] AR 38–55.

[11] AR 40.

[12] AR 38–55.

[13] AR 12, 29.

[14] AR 152–53.

[15] AR 1–6.

for summary judgment on March 29, 2019.[16] The Commissioner opposed the motion and filed a cross-motion for summary judgment on April 26, 2019.[17] The plaintiff filed a reply on May 10, 2019.[18]

## 2. Summary of the Administrative Record

### 2.1 Mission Peak Orthopaedics (Knee Surgery) — Treating

The plaintiff received treatment for her right knee at Mission Peak Orthopaedics ("Mission Peak") from February 2011 to August 2011.[19]

On February 17, 2011, Ashay Kale M.D., evaluated the plaintiff for chronic pain in her right knee.[20] She could not remember a recent specific injury to her knee, but the pain was so severe that she had to go the emergency room.[21] Dr. Kale found the following in an examination:

> In general, she is a morbidly obese female in no acute distress, height is 5 feet 3 inches. Weight is reported at 184 pounds, but she appears heavier upon inspection. Examination of her right knee show morbid obesity about the soft tissue. She has tenderness to palpation diffusely around the knee, not localized to any particular area. There is tenderness over both medial and lateral joint line. There is discomfort with attempted active and passive range of motion. There is no instability in the knee. Distal neurovascular status intact.[22]

X-rays showed "moderate narrowing of the medial joint space and patellofemoral joint space."[23] Dr. Kale found that the plaintiff had "moderate osteoarthritis of [the] right knee with probable degenerative meniscal tears."[24] She counseled the plaintiff "as to the importance of weight loss to unload the joint including the knee joints" and recommended that plaintiff receive a corticosteroid

---

[16] Compl. – ECF No. 1; Mot. – ECF No. 18-1.

[17] Cross Mot. – ECF No. 19.

[18] Reply – ECF No. 20.

[19] AR 646–653.

[20] AR 652–53.

[21] AR 652.

[22] *Id.*

[23] AR 653.

[24] *Id.*

injection and an MRI scan to evaluate the menisci and the articular cartilage.[25] She gave the plaintiff the injection on that date.[26]

On May 3, 2011, the plaintiff, following the corticosteroid injection in her knee, reported pain in her right knee and said that the injection only temporarily relieved her symptoms and she had to go the ER several times because of the pain.[27] Dr. Kale found that the plaintiff had signs of a torn meniscus and chronic chondromalacia of the patella.[28] Dr. Kale also noted that there were arthritic changes in the knee.[29] The plaintiff had arthroscopy on May 11, 2011 to repair a torn meniscus and chondromalacia patella in her right knee.[30]

The plaintiff had a follow-up visit nine days after surgery with physician's assistant ("PA") Aklil Rostai.[31] He noted that the plaintiff's incisions were healing well and discussed the importance of physical therapy and home exercise.[32] He prescribed her 40 Norco pills because her previous medication, MS Contin, upset her stomach.[33] By June 6, 2011, the incisions had healed, and the plaintiff had "excellent active and passive ranges of motion."[34] There was "still mild-to-moderate tenderness over the medial and lateral joint line, but this [was] much improved compared to prior to surgery," according to Dr. Kale.[35]

On June 29, 2011, a supplemental report said that the plaintiff's meniscus tear and joint damage occurred on March 17, 2011, when she twisted her right knee while walking on a wet

---

[25] *Id.*

[26] *Id.*

[27] AR 651.

[28] *Id.*

[29] *Id.*

[30] AR 661–2.

[31] AR 650.

[32] *Id.*

[33] *Id.*

[34] AR 649.

[35] *Id.*

floor.[36] The report attributed twenty percent of the plaintiff's pre-surgery symptoms to patellofemoral joint-degenerative joint disease and eighty percent "due to lateral meniscus tear and exacerbation of patellofemoral pain after her fall."[37] Findings at the time of the arthroscopy were "a complex tear of the lateral meniscus and significant chondromalacia and degenerative changes in the patellofemoral joint."[38] The surgery was successful, the plaintiff's symptoms had improved significantly, and she had "full active and passive range of motion" in her right knee.[39] There was "mild discomfort over the lateral joint line and some mild anterior crepitus with range of motion of the patella."[40] Dr. Kale told the plaintiff that she should continue physical therapy and could be prescribed pain medications only for six weeks to two months more.[41] After that, she would be referred to a pain management specialist.[42]

On August 4, 2011, Dr. Kale noted that the plaintiff's knee had some residual swelling but a normal range of motion.[43] Her incisions were healed, and her distal neurovascular status was intact.[44] She had "patellofemoral arthrosis," which she had to address "if she desire[d] to have a pain free knee."[45] Dr. Kale referred "her to pain management consisting of evaluation by Dr. Schuchard" and noted that the plaintiff would follow up with her on "an as needed basis."[46]

---

[36] AR 647.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] AR 648.

[42] *Id.*

[43] AR 646.

[44] *Id.*

[45] *Id.*

[46] *Id.* There are no records of an evaluation or treatment by Dr. Schuchard.

## 2.2 St. Rose Hospital (Physical Therapy) — Treating

From June 2011 to October 2011, the plaintiff had physical therapy at St. Rose Hospital following the arthroscopy.[47]

On June 22, 2011, physical therapist ("PT") Shannon McGann "trained [the plaintiff for] use and self-application of ace wrap for edema."[48] PT McGann's treatment plan was to "assess [the] efficacy of ace wrap and self [massage]" and to obtain an order for a knee brace.[49] The plaintiff filled out a "Patient Information Record" form.[50] She rated her pain (from lowest to highest) as a three to eight on a scale of one to ten.[51] On an "Activities of Daily Living Assessment," she reported being "unable" to reach her bra strap, put on pants or shorts, reach her back pocket, clean, wash dishes, do laundry, get out of bed, carry, push or pull five to 100 pounds, do yardwork, or do other recreational activities.[52] With "great difficulty," she could put on a shirt or jacket, cook, grocery shop, walk on level and uneven surfaces, walk up and down stairs, walk over curbs and up ramps, get out of the shower or tub, get out of the car, sit for 30 minutes, stand for 40 minutes, bend, lift or reach below her waist, and bend, lift or reach above shoulder level.[53] She reported "moderate difficulty" brushing her hair, brushing her teeth, shaving, bathing, driving, and bending, lifting or reaching overhead.[54] She had "some difficulty" typing on a keyboard.[55]

On June 23, 2011, the plaintiff had an appointment with PT David Cattanach.[56] Her pain level was a seven out of ten, and her knee was tender to palpation.[57] His instructions were "the gym at

---

[47] AR 374–398.

[48] AR 391.

[49] AR 392.

[50] AR 393–96.

[51] AR 394.

[52] AR 395–96.

[53] *Id.*

[54] *Id.*

[55] AR 396.

[56] AR 389–390.

[57] AR 389.

home: functional walking."[58] On July 1, 2011, the plaintiff saw PT Gary Tom, who noted that she

had improved from her last visit.[59] She was "unable to recall why [her] knee was so painful" on

the last visit.[60] Her pain level was still seven out of ten.[61]

On July 6, 2011, PT McGann noted that the plaintiff could stand and walk following the

arthroscopy and could perform "light house cleaning."[62] Her "initial transition [from] sit [to] stand

[and the] first steps to follow [were] generally difficult."[63] According to PT McGann, "good relief

[was] achieved," and "[the] plaintiff would benefit from a stable wrap around knee brace to

prevent medical rotation [] while relieving patellar compression."[64]

On July 8, 2011, PT McGann had the plaintiff do "gait training on [a] treadmill."[65] She applied

tape to the plaintiff's tibia to "support patellar decompression."[66] She gave the plaintiff "written

instructions for [removing the tape]" and "cautioned [the plaintiff] to limit walking on the

treadmill for 10 minutes."[67]

On August 2, 2011, the plaintiff had a pain level of five out of ten.[68] She was "walking 10–20

[minutes and] completing [her] exercises daily."[69] The edema "throughout [the plaintiff's] joint

[was] mild compared to [the] last appointment."[70] The emphasis of the physical therapy was "to

release adhesions and begin patellar retraining," but edema limited the plaintiff's tolerance to

---

[58] *Id.*

[59] AR 388.

[60] *Id.*

[61] AR 387.

[62] AR 385.

[63] *Id.*

[64] AR 384.

[65] AR 383.

[66] *Id.*

[67] *Id.*

[68] AR 381.

[69] *Id.*

[70] *Id.*

physical therapy.[71] Her treatment plan was "functional activity training, [a] home exercise program, manual therapy, taping, therapeutic exercise and injury prevention technology."[72]

On October 25, 2011, PT McGann terminated the plaintiff's physical-therapy services because the plaintiff did not return for her scheduled appointment.[73] In her report, PT McGann noted that the plaintiff had increased her range of motion, increased her muscle performance, increased her functional status for home, recreation, and community, decreased her pain, improved her joint alignment and stability, improved her ability to self-manage symptoms, and reduced her risk of reinjury.[74]

### 2.3   Bhupinder N. Bhandari, M.D. — Treating

Bhupinder N. Bhandari, M.D., at Mission Primary Care Group, treated the plaintiff from May 5, 2011 to January 15, 2014.[75]

On November 29, 2011, PA Muhammad Khan and Dr. Bhandari noted that the plaintiff's existing problems were "menopause, depression, hypertension, GERD, obesity and hyperlipidemia."[76] The plaintiff said that she felt sad and gloomy "more often than not[,]" had blurry vision, insomnia, and tinnitus and occasionally lost her hearing.[77] Her treatment plan was a low-salt diet, exercise to lose weight, and a prescription of Lexapro.[78]

On February 2, 2012, the plaintiff complained that her legs and feet were swollen.[79] On February 15, 2012, she said that "if she skips the Norco she feels restless [and has] hand

---

[71] AR 376.

[72] *Id.*

[73] AR 375.

[74] *Id.*

[75] AR 399–500. The records contain hand-written notes that are illegible.

[76] AR 425, 438.

[77] AR 437.

[78] AR 438.

[79] AR 464.

tremors."[80] Dr. Bhandari noted that the plaintiff's behavior showed the potential for drug abuse.[81] He prescribed her 90 Norco pills and 30 Ambien pills.[82] On February 28, 2012, the plaintiff told Dr. Bhandari that "her prescription was stolen in a car theft."[83] His note said that she was "on medications that cause[d] her to be forgetful[,]" namely, Norco, Ambien, Diclofenae, and Phenegan.[84]

On August 16, 2012, the plaintiff reported feeling depressed to PA Khan and wanted extra medication for her leg pain.[85] PA Khan prescribed her Paxil.[86] On August 23, 2012, she complained of knee pain and was prescribed Norco.[87] On August 30, 2012, she asked for an early refill of her medications because "by mistake she threw all her meds in [the] garbage." [88] PA Khan noted that her "existing problems [were] insomnia, knee pain and depression."[89] He prescribed her Ambien and recommended weight management, diet and exercise.[90] On November 15, 2012, PA Khan noted that the plaintiff suffered from headaches and depression.[91]

On February 20, 2013, the plaintiff said she had pain in her right knee, and asked PA Khan for an early refill of her prescription for a trip to Canada.[92] PA Khan prescribed her 120 Norco pills and 60 famotidine pills.[93] On May 1, 2013, the plaintiff said that she was "sad and gloomy" and

---

[80] AR 463.

[81] *Id.*

[82] *Id.*

[83] AR 460.

[84] AR 497. The note is addressed to "To whom it may concern[.]"

[85] AR 447.

[86] *Id.*

[87] AR 446.

[88] AR 445.

[89] *Id.*

[90] *Id.*

[91] AR 427.

[92] AR 419.

[93] AR 420.

wanted to "start taking Zoloft for her depression."[94] He prescribed her Zoloft, Ambien and Norco.[95] She told Dr. Bhandari on June 20, 2013 that she felt "depressed, sad and gloomy most of the time, [and endured] stomach aches for two days, [with] stabbing pain."[96] He prescribed her Norco, Paxil, and omeprazole.[97]On July 11, 2013, the plaintiff reported to PA Khan that she fell and injured her head and leg.[98] Her existing problems were "LBP [and] obesity."[99] He "referred her to [the] ER for [a] checkup" and prescribed her Vicodin and ibuprofen.[100]

On September 18, 2013, X-rays of the plaintiff's legs revealed the following: "[her] tarsal bones show[ed] normal alignment and signal intensity pattern;" "[her] tendoachilles show[ed] normal intensity pattern[, n]o obvious tear seen;" she had "small superior and inferior calcaneal spurs;" the "muscle groups around [her] ankle [were] normal;" and "[n]o obvious mass lesion seen."[101] Her major tendons and neurovascular bundle were normal.[102] Impressions of the X-rays also included "[a] mild chronic sprain of deltoid and posterior talofibular ligament" and "DJD with fluid accumulation at talonavicular joint."[103]

On September 12, 2013, the plaintiff told PA Khan that she fell from a second floor.[104] She reported that her leg was swollen and her back and head hurt.[105] On December 9, 2013 she had radiating leg pain, heartburn, and headaches.[106] PA Khan noted that her existing problems were

---

[94] AR 433.

[95] AR 434.

[96] AR 435.

[97] AR 436.

[98] AR 414.

[99] AR 415.

[100] *Id.*

[101] AR 416.

[102] *Id.*

[103] *Id.*

[104] AR 410.

[105] *Id.*

[106] AR 404.

"LBP, OA [and] insomnia."[107] He prescribed Norco and Ambien.[108] On December 23, 2013, the plaintiff told PA Khan that she needed a refill of her pain medication because "her apartment caught on fire and all her stuff, including her pain medications [burned]."[109] Her existing problems were trauma in her right knee, hyperlipidemia, and obesity.[110] He prescribed her Ambien and tramadol.[111] On January 2, 2014, the plaintiff had the flu and wanted a glucose test.[112]

### 2.4    St Rose Hospital (Emergency Department) — Treating

The plaintiff visited the emergency department at St. Rose multiple times from March 2012 to October 2013.[113]

On March 13, 2012, Dimpi Kalira, M.D., treated the plaintiff.[114] She had pain and tenderness in her right knee.[115] Her condition was "exacerbated by movement . . . [and] walking" and was "relieved by prescription medications, Norco–Vicodin."[116] During the visit, the plaintiff was "oriented to person, place and time."[117] The plaintiff said that she was "active and exercising routinely[,]" denied an "inability to bear weight or ambulate," and said that she was planning a trip to Canada to get a knee replacement.[118] On examination, her right knee had "no swelling," a normal range of motion, and "[d]iffuse, non-localized mild tenderness."[119] The plaintiff's pain was

---

[107] *Id.*

[108] AR 405.

[109] AR 403.

[110] AR 411.

[111] *Id.*

[112] AR 401.

[113] AR 299–398.

[114] AR 367.

[115] AR 368.

[116] *Id.*

[117] AR 369.

[118] AR 368.

[119] AR 369.

"level [nine], using numeric pain scoring."[120] Dr. Kalira's diagnosis was "arthralgia" in the right knee.[121] She prescribed Norco and Vicodin and discharged the plaintiff.[122]

On June 25, 2012, the plaintiff told Tony H. Yuan, M.D., that she was running out of pain medication.[123] Dr. Yuan found that she was ambulatory, had a steady gait, and was "oriented to person place and time."[124] She had a history of musculoskeletal disorder, sciatica, and osteoarthritis in her left hip and right knee.[125] Her range of motion and motor strength in her lower extremities was "normal." [126] He diagnosed her with sciatica and leg pain and prescribed 20 Norco pills.[127]

On November 23, 2012, Jeremy Graff, M.D., treated the plaintiff in the emergency department.[128] The plaintiff fell between 4:00 p.m. and 5:00 p.m. that afternoon and had pain in her right knee radiating down her leg.[129] She reported "chronic arthritis and arthralgias in [her] right knee and hip."[130] She told Dr. Graff that she ran out of medication and that her primary-care doctor told her to get her prescriptions filled in the emergency room.[131] She rated her pain as a ten out of ten.[132] Dr. Graff's diagnosis was osteoarthritis.[133] He noted that there were "[n]o red flags" and refilled her prescription for Norco.[134]

---

[120] AR 370.

[121] AR 369.

[122] AR 371.

[123] AR 362.

[124] AR 364.

[125] AR 362.

[126] AR 363.

[127] AR 363−65.

[128] AR 355.

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] AR 355−57.

[133] AR 356

[134] AR 356, 358.

On May 27, 2013, the plaintiff presented for a refill of her pain medication.[135] She had dull, throbbing pain in her knee, and her symptoms were "severe."[136] Her condition was exacerbated by movement and walking and was relieved by prescription medications.[137] Dr. Graff's diagnosed her with joint pain.[138] He noted that a hospital report showed "multiple MDs rx opiates."[139] He "confronted [the plaintiff] and [she] underst[ood] no more pain meds from the emergency department."[140] He prescribed her 12 tablets of Norco.[141]

On July 7, 2013, the plaintiff entered the emergency department with "shooting" pain in her back and right leg after "falling off" two steps of stairs the previous day.[142] David A. Wei, M.D., treated her.[143] She reported a pain level of "9/10" and said that she had run out of Norco three days before and her primary-care physician was out of town.[144] An examination of her back "included findings of [a] normal inspection[.]"[145] She had a "normal range of motion, despite some tenderness."[146] She had a normal range of motion in her lower extremities.[147] She "tolerated the [procedure] well."[148] Dr. Wei diagnosed her with a "back pain injury" and recommended back

---

[135] AR 348.

[136] *Id.*

[137] *Id.*

[138] AR 349.

[139] *Id.*

[140] *Id.*

[141] AR 351.

[142] AR 340.

[143] AR 339.

[144] AR 340.

[145] AR 341.

[146] *Id.*

[147] *Id.*

[148] AR 343.

exercises.[149] She was administered Norco (hydrocodone Bit/Acetaminophen) and given a prescription for 20 "10mg−325mg" tablets.[150]

On July 11, 2013, the plaintiff reported that she "was walking [on] the patio, [the] patio broke and her foot got caught between the wood[,]" and she "pass[ed] out for [an] unknown amount of time."[151] She reported low-back pain and head pain.[152] At the emergency department, she was ambulatory.[153] She rated her pain as a ten out of ten and said that she "put on braces to her legs to deal with the pain."[154] Dr. Graff found that her back and right leg were "tender to palpation" but that she had a full range of motion.[155] Her X-rays were "normal."[156] They revealed no acute findings: the plaintiff had degenerative change and osteophytes in her right knee, a mild degenerative disc in her L3−L4 vertebrae, and no fracture or dislocation in her ankle.[157] Dr. Graff diagnosed the plaintiff with a back strain and a knee contusion.[158] He prescribed 12 tablets of Norco and noted that the plaintiff received 20 tablets of Norco at the emergency department "just this weekend."[159]

Armando Samaniego, M.D., examined the plaintiff on August 1, 2013.[160] The plaintiff reported pain in her right knee at a level of "8/10."[161] Her condition was exacerbated by walking.[162] She requested a refill of her pain medication because her primary-care physician was

---

[149] AR 343–44.

[150] AR 344.

[151] AR 324, 327.

[152] AR 327.

[153] Id.

[154] AR 324.

[155] AR 325.

[156] AR 326.

[157] AR 335–37.

[158] AR 326.

[159] AR 326, 330.

[160] AR 315.

[161] Id.

[162] Id.

out of town.[163] She was "unable to take ibuprofen because [it] cause[d] [her] stomach [to be] upset," but Norco did not have those side effects.[164] He diagnosed her with knee pain and a knee contusion and dispensed one Norco pill.[165]

On August 26, 2013, the plaintiff went to the emergency department after she fell through a "patched hole" on the second floor of her apartment complex.[166] She reported dull pain at a level 10 radiating from her right hip to right foot that was relieved by "nothing."[167] She was "running out of [] pain medication."[168] A nursing assessment noted that she arrived ambulatory with a steady gait and appeared in distress due to pain.[169] An inspection of her right lower extremity resulted in findings of numbness and signs of infection.[170] Edris Afzali, M.D., diagnosed her with joint pain in her ankle and foot.[171] He prescribed 12 tablets of Norco.[172] The plaintiff refused to wait to get fitted for a postop-shoe and left the emergency department.[173]

On October 2, 2013, the plaintiff went to the emergency department using a crutch and complained of pain and swelling in her right leg.[174] She told Tan Nguyen, M.D., that she "was sent [t]here by Dr. Cheung to get a long leg brace for her right leg that was injured in a fall from the balcony of her apartment complex on July 11, 2013."[175] Dr. Nguyen found that both the plaintiff's "knee and ankle [had] good ROM[,]" with mild swelling in her right ankle.[176] Dr. Nguyen called

---

[163] *Id.*

[164] *Id.*

[165] AR 317−319.

[166] AR 309.

[167] AR 307, 309.

[168] AR 307.

[169] AR 309.

[170] *Id.*

[171] AR 308.

[172] AR 310.

[173] *Id.*

[174] AR 301, 303.

[175] AR 300−301.

[176] AR 301.

Dr. Cheung, who "said he did not tell the patient to come to [the] ER for [a] long leg splint" and that "she might have [had,] at most an ankle sprain, which would not need a long leg splint."[177] Dr. Nguyen recommended an X-ray of the plaintiff's ankle, tibia and fibula.[178] The plaintiff agreed but left immediately against medical advice.[179]

## 2.5 Norman Cheung, M.D. — Treating

The plaintiff saw Norman Cheung, M.D., an orthopedist, from April 16, 2012 to December 1, 2014 for pain in her lower extremities.[180] Dr. Bhandari referred the plaintiff to Dr. Cheung.[181] Dr. Cheung treated the plaintiff, among other things, by injecting corticosteroid into the plaintiff's knees.[182]

On April 16, 2012, Dr. Cheung ordered an MRI.[183] On August 10, 2012 and October 2, 2012, he recommended that the plaintiff get X-rays.[184]

On August 19, 2014, the plaintiff, who received a cortisone injection in May, reported to Dr. Cheung that the pain in her knees was returning.[185] On examination, the plaintiff's gait was normal, and her right knee had a "full range of motion with pain," "no instability," and mild tenderness from palpation on the medial jointline, lateral jointline and peripatellar.[186] Her right ankle had no ecchymosis or redness, "minimal to mild swelling[,]" and "mild tenderness to palpation [of the] lateral ligaments."[187] Dr. Cheung diagnosed her with a "sprain and strain of [the]

---

[177] Id.

[178] AR 302−304.

[179] Id.

[180] AR 527−548, 554−573. The records of this treatment contain hand-written notes that are illegible.

[181] AR 535−539. Letters from Dr. Cheung addressed to Dr. Bhandari state, "Dear Dr. Bhandari, Bhupinder… Thank you for allowing me to see your patient, [the plaintiff] …Thank you again for your kind referral."

[182] AR 528−529, 531.

[183] AR 548.

[184] AR 540, 545.

[185] AR 528.

[186] Id.

[187] Id.

tibiofibular (ligament) [and] primary localized osteoarthritis, lower leg."[188] He administered a cortisone injection in her right knee and gave her an ankle brace.[189] The plaintiff asked for a refill of her Norco prescription, but Dr. Cheung said she could not receive narcotics from two medical providers and noted that the CURES report showed that Dr. Rowley prescribed her 120 tablets of Norco on July 31, 2014.[190] He scheduled a follow-up appointment in six weeks.[191]

On September 24, 2014, the plaintiff reported that her right knee felt better after an injection in August, but her right ankle hurt and she wanted surgery.[192] Dr. Cheung found that the plaintiff's knees were "stable," she was walking "without an assisted device," and she had "pain on palpation diffusely."[193] He diagnosed her with "primary localized osteoarthritis."[194] He administered a cortisone injection in her left knee and recommended podiatry.[195] He reviewed her medications with her, "taking Norco 5-325 MG Tablet[,] 1 tablet as needed every 8 hrs."[196]

On December 1, 2014, the plaintiff complained of pain in her left knee.[197] He diagnosed her with primary localized arthritis in her left leg.[198] Dr. Cheung said he could not give her another cortisone injection because it was too soon after the September 24 injections.[199] Her records reflected the same Norco prescriptions.[200]

---

[188] AR 529.

[189] Id.

[190] Id. CURES is an acronym for California's Controlled Substance Utilization Review and Evaluation System. CURES contains, among other things, the records of all prescriptions for controlled substances dispensed in California. See United States of America v. State of California, No.: 18cv2868-L-MDD, 2019 WL 2498316, at *1 (S.D. Cal. Mar. 5, 2019).

[191] Id.

[192] AR 531.

[193] Id.

[194] Id.

[195] Id.

[196] Id.

[197] AR 533.

[198] Id.

[199] Id.

[200] Id.

### 2.6 Hayward Family Care — Treating

The plaintiff was treated at Hayward Family Care from May 2014 to November 2016.[201]

On May 6, 2014, PA Linda Deivert reported that the plaintiff "was on a second story patio which collapsed in [July 2013 and] injured her right shoulder, knees, and back."[202] The plaintiff had "severe pain since the accident."[203] She took "Norco 325 10-mg dose 4 times per day, tramadol and medication for sleeping."[204] PA Deivert diagnosed the plaintiff with a backache, and noted she would "continue care with Drs. Cheung and Hua" and continue Norco and tramadol.[205] On June 5, 2014, the plaintiff followed up with PA Deivert about back pain from her fall from her second story patio.[206] The plaintiff "[h]ad an MRI which was abnormal" and "Dr. Hua [had] recommended surgery, possibly a laminectomy."[207] PA Deivert referred her to a neurosurgeon "for a second opinion concerning lumbar surgery" and told her to continue Norco, zolpidem, and tramadol.[208]

On June 23, 2014, the plaintiff saw Robert Rowley, M.D..[209] The plaintiff was "using hydrocodone regularly [] for pain from [a] fall, including headaches, sensation of blurred vision and eyes hurting, and right-sided pain."[210] She used a cane for assistance.[211] She complained of depression.[212] "A neurosurgeon [was] planning on doing interventions on [her] L-spine and C-

---

[201] AR 574–633, 713–803.

[202] AR 596.

[203] *Id.*

[204] *Id.*

[205] *Id.*

[206] AR 594.

[207] *Id.*

[208] *Id.*

[209] AR 593.

[210] *Id.*

[211] *Id.*

[212] *Id.*

spine."[213] Dr. Rowley "[d]iscussed risks of worsening of dependence and addiction with continued use of Norco as a monotherapy."[214] He diagnosed the plaintiff with major-depressive disorder in a single episode and a backache and prescribed naproxen for inflammation and sertraline hydrochloride for depression.[215]

On July 16, 2014, the plaintiff saw Raul Gentini, M.D., after cutting her finger on a blender.[216] She had a small one-centimeter laceration on her right fingertip.[217] She had "no pain in [her] muscles or joints, no limitation of range of motion[, and] no paresthesia or numbness."[218] She asked for Norco for "pain control."[219] Dr. Gentini noted that she had a prescription on July 3, and the plaintiff said that she had not picked it up yet.[220] He diagnosed the plaintiff with "Laceration of finger, Major depressive disorder, single episode [to a] severe degree, [and a] Backache."[221] He prescribed Keflex.[222]

On July 31, 2014, the plaintiff had swelling and pain in her lower extremities and also complained of heartburn and nausea.[223] PA Deivert diagnosed the plaintiff with "Insomnia, [a] Headache, Reflux Esophagitis [and] Lumbosacral radiculitis."[224] The plaintiff was told to continue Norco and zolpidem and to start verapamil and omeprazole.[225]

---

[213] *Id.* The record does not indicate this surgery happened.

[214] *Id.*

[215] *Id.*

[216] AR 591.

[217] *Id.*

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.*

[222] *Id.*

[223] AR 590.

[224] *Id.*

[225] *Id.*

On September 3, 2014, the plaintiff asked for a refill of Norco from Dr. Gentini because she forgot her prescription in Oregon.[226] She said she had scheduled back surgery that month.[227] Dr. Gentini did not prescribe Norco "this visit" (noting that her prescription was not due until September 19) and recommended the plaintiff begin taking Naproxen for pain.[228] He diagnosed her with a "Backache, [] Insomnia, [] Major depressive disorder, single episode, severe degree, without mention of psychotic behavior [and] Lumbosacral radiculitis."[229]

On September 5, 2014, the plaintiff asked for a refill of Norco for her back and leg pain because she forgot her pills in Oregon.[230] PA Deivert declined to refill the prescription and diagnosed her with "Lumbosacral radiculitis."[231]

On October 3, 2014, the plaintiff asked to see a podiatrist because she had "right ankle pain and numbness of the distal extremity and foot."[232] She used a cane to walk.[233] The plaintiff had "tenderness with palpation of [her] right lateral maleolus."[234] PA Deivert diagnosed the plaintiff with ankle-joint pain.[235] She told the plaintiff that her "lower extremity, ankle, and foot symptoms are probably related to the chronic back pain" and referred her to Dr. Ternus.[236]

On October 10, 2014, the plaintiff requested Norco, tramadol, and zolpidem prescriptions because she was planning a trip to Canada.[237] There was tenderness in the plaintiff's right ankle,

---

[226] AR 589.

[227] Id.

[228] Id.

[229] Id.

[230] AR 588.

[231] Id.

[232] AR 587.

[233] Id.

[234] Id.

[235] Id.

[236] Id.

[237] AR 586.

and she used a cane while walking.[238] Dr. Gentini diagnosed her with "Combined opioid with other drug dependence [and a] Backache unspecified."[239] He told her to continue tramadol and gave her 120 Norco pills.[240]

On October 24, 2014, the plaintiff reported pain in her back and both lower extremities.[241] She said that Sherwin Hua, M.D., had recommended surgery, but she was seeking a second opinion.[242] PA Deivert diagnosed the plaintiff with "Back and lower extremity pain post-fall, Insomnia, Lumbosacral radiculitis, [and] Combined opioid with other drug dependence."[243] She prescribed gabapentin and told the plaintiff to continue zolpidem and Norco.[244]

On October 24, 2014 the plaintiff said that "Dr. Hua, the neurosurgeon, was going to be on vacation for one month."[245] The plaintiff "[c]ontacted [Hayward Family Care] on 10-30 stating that [she] brought in all her pain medication to Dr. Tse, the pain medication specialist, but had lost the medication in [Dr. Tse's] office."[246] PA Deivert contacted both doctors and determined that Dr. Hua was not on vacation and was not going on vacation, and the plaintiff had not been to Dr. Tse's office.[247]

On November 4, 2014, the plaintiff saw PA Deivert to discuss the use of pain medication.[248] She "discussed with the [plaintiff] at length if [she] was having increased pain or was taking medication for other reasons but [the plaintiff] did not reply."[249] PA Deivert told the plaintiff to

---

[238] Id.

[239] Id.

[240] Id.

[241] AR 582.

[242] Id.

[243] Id.

[244] Id.

[245] AR 581.

[246] Id.

[247] Id.

[248] Id.

[249] Id.

continue naproxen and gabapentin and noted that she would check with the pharmacy about when the plaintiff's prescription for Norco was to be refilled.[250] She also gave the plaintiff a "lab order for fasting comprehensive metabolic panel, CBC, TSH, and a lipid panel."[251]

On November 20, 2014, the plaintiff arrived wearing a brace and using a cane, reported increased pain in her left knee, and asked to see an orthopedist.[252] Her shoulders and hips had no tenderness and good ranges of motion.[253] There was "no crepitus, tenderness or erythema" in her knees, but there was "pain on palpation" in the left knee.[254] Both ankles were normal and had a good range of motion.[255] PA Deivert "referred [her to] an orthopedist at Mission Peak" and told her to continue Norco and zolpidem.[256]

On December 3, 2014, the plaintiff complained of back pain and asked for a refill of Norco.[257] The plaintiff's lower back had "no spasms or bony abnormalities[, a] decreased [range of motion] and SI joint tenderness."[258] Dr. Gentini diagnosed her with "Low back pain [and] Opioid dependence" and prescribed her 10 Norco pills.[259] She returned two days later for "severe back pain."[260] PA Deivert's diagnosis was "Low back pain [and] Opioid dependence."[261] She instructed the plaintiff to continue Norco and gabapentin.[262]

---

[250] *Id*

[251] *Id*.

[252] AR 615−16.

[253] *Id*.

[254] *Id*.

[255] *Id*.

[256] AR 615. *See* section 2.7 for the plaintiff's treatment at Mission Peak.

[257] AR 617–19.

[258] AR 619.

[259] AR 619−620.

[260] AR 623.

[261] *Id*.

[262] 623−624.

On January 30, 2015, the plaintiff said she had decided to forgo surgery and that she had "chronic back pain with radiation to the lower extremities."[263] The plaintiff had scheduled an epidural with Dr. Co Banh and had begun taking fluoxetine, which made her feel better.[264] PA Deivert diagnosed her with "Low back pain with radiation[,] Opioid dependence, [and] Depressive disorder-Improved."[265] PA Deivert recommended she continue Norco and fluoxetine and see a therapist.[266]

On March 4, 2015, the plaintiff said she had fallen "from the third stair of [a] stairway."[267] She complained of "trauma on her lower back and leg [] and [a] lack of energy."[268] Dr. Gentini diagnosed her with "Low back pain," instructed her to "stay active and return to normal activities, limit bed rest," and suggested "heat wrap therapy combined with short session ice therapy."[269] He prescribed 30 tablets of baclofen.[270]

On December 7, 2015, the plaintiff told PA Deivert that while she "was supposed to be working at the front desk of a hotel but instead was cleaning the bathrooms and doing laundry," "[a] cart flipped while she was pushing it," and she had "chronic back and knee pain after a fall."[271] She quit her job two weeks earlier but wanted "to try again without restrictions."[272] She had "an appointment with Dr. Molina for knee injections."[273] There was "tenderness and pain on palpation" in both knees and "tenderness on palpation" of her spine.[274] PA Deivert's diagnosis was

---

[263] AR 719.

[264] *Id. See* section 2.7 for Dr. Banh's treatment of the plaintiff's spine at Mission Peak.

[265] *Id.*

[266] *Id.*

[267] AR 715.

[268] *Id.*

[269] AR 715–16.

[270] AR 715.

[271] AR 793.

[272] *Id.*

[273] *Id. See* section 2.7 for Dr. Molina's treatment of the plaintiff's knees at Mission Peak.

[274] AR 793.

"Low back pain [and] Knee pain[.]" PA Deivert gave the plaintiff a note saying the plaintiff could return to work and said that she would follow up during the week "to determine if [the plaintiff] had returned to work, filled out disability forms and had a return to work date."[275] She prescribed the plaintiff hydrocodone-acetaminophen and amoxicillin.[276]

On February 11, 2016, the plaintiff asked PA Deivert for a disability note, stating "the last day she was able to work."[277] The plaintiff was "wearing bilateral knee braces."[278] She said that she was injured at work and had "chronic back and knee pain after a fall from a second story balcony."[279] "Mainly [she] was having knee pain."[280] The injections she received from Dr. Molina "[had] not been not helpful."[281] PA Deivert diagnosed the plaintiff with "Fatigue, Knee pain [and] Low back pain" and issued a note that said the plaintiff "was unable to work beginning on 11-14-15."[282] She directed the plaintiff to "continue [her] care with Dr. Molina" and to continue hydrocodone-acetaminophen. [283]

On April 5, 2016, the plaintiff came to an appointment wearing dual knee braces and reported that her ankle had been painful and swollen since November 14, 2016, when a laundry cart fell on it.[284] PA Deivert diagnosed the plaintiff with ankle and knee pain, told her to continue hydrocodone-acetaminophen, and referred her for X-rays.[285]

---

[275] AR 794.

[276] AR 794−795.

[277] AR 782−783. PA Deivert's notes do not indicate any other details about the plaintiff's request.

[278] AR 784.

[279] AR 783.

[280] Id.

[281] Id.

[282] AR 784.

[283] Id.

[284] AR 774.

[285] Id.

On April 26, 2016, the plaintiff asked for a refill of her prescription for hydrocodone-acetaminophen because she was going to Canada to see her chronically ill sister.[286] She reported that she had an appointment with Dr. Cheung in May.[287] PA Deivert diagnosed the plaintiff with "Knee pain, Low back pain, Opioid dependence [and] Insomnia" and advised her that she "could not give her a refill of hydrocodone-acetaminophen at [that] time."[288]

On May 31, 2016, the plaintiff asked for a refill of her hydrocodone-acetaminophen and gabapentin prescriptions.[289] She "stated that [she] had a scheduled appointment with Dr. [Cheung] in May . . . [but] his office never contacted her."[290] She was also fired from her job at the Holiday Inn.[291] She had "hired a lawyer and [would] be filing a [w]orkers' compensation claim."[292] PA Deivert diagnosed the plaintiff with "Knee pain, Low back pain, Dental caries, Opioid dependence, Hyperglycemia [and] Hazy vision" and told her to see "Dr. Cheung as soon as possible."[293] She directed the plaintiff to continue hydrocodone-acetaminophen and gabapentin and to start amoxicillin.[294]

On June 22, 2016, the plaintiff asked for an early refill of pain medication from Dr. Gentini because she had forgot her medication in Canada the week before.[295] Dr. Gentini evaluated the plaintiff's psychiatric state as "active and alert," "good judgment," oriented "to time, place and

---

[286] AR 772.

[287] Id.

[288] Id.

[289] AR 770.

[290] Id.

[291] Id.

[292] Id.

[293] Id.

[294] Id.

[295] AR 766–67.

person," and normal recent and remote memory.[296] He diagnosed her with "Knee pain and Vitamin deficiency" and told her to continue hydrocodone-acetaminophen and amoxicillin.[297]

On August 26, 2016, the plaintiff said that she had begun seeing Darien Behravan, D.O., at Bay Area Pain and Spine Institute for shoulder and ankle pain resulting from a work-related incident.[298] She was wearing bilateral knee braces and using a cane.[299] PA Deivert gave her a "lab order for a fasting comprehensive metabolic panel, CBC, TSH, hemoglobin A1c, and a lipid panel."[300] She advised the plaintiff to continue hydrocodone-acetaminophen and temazepam, and to schedule "an appointment with Dr. Behravan specifically for chronic back and knee pain."[301]

On September 20, 2016, PA Deivert asked the plaintiff why she had not discussed her back and knee injuries with Dr. Behravan.[302] "The [plaintiff] stated that Dr. Behravan did not accept her insurance."[303] PA Deivert diagnosed her with knee and back pain, and insomnia.[304] She prescribed the plaintiff 30 tablets of temazepam for insomnia, 180 tablets of hydrocodone-acetaminophen for her low back and knee pain, and 60 capsules of gabapentin.[305]

On October 12, 2016, the plaintiff asked PA Aryn Earnhardt for a replacement prescription of Norco because her pharmacy was only able to fill half her prescription because it ran out of Norco.[306] Her pain from chronic sciatica and her fall in 2013 were terrible.[307] Her back was

---

[296] AR 768.
[297] Id.
[298] AR 761.
[299] Id.
[300] Id.
[301] Id.
[302] AR 758.
[303] AR 759.
[304] Id.
[305] Id.
[306] AR 756.
[307] Id.

"killing her."[308] The plaintiff was ambulating normally, had "no contractures, malalignment, tenderness or bony abnormalities and [had] normal movement of all extremities."[309] PA Earnhardt called the pharmacy and was told that the plaintiff had been prescribed the full 180 tablets on her refill date, September 21, 2016, and that the pharmacy "had problems with [the plaintiff] in [the] past with going to different pharmacies and different providers."[310] PA Earnhart diagnosed the plaintiff with "Chronic pain [and] Opioid dependence" and told her that no additional prescriptions would be prescribed that day.[311]

On November 8, 2016, PA Deivert and the plaintiff discussed the provider's policy on controlled medications and the "qualities of addiction," and she offered to contact the plaintiff's insurance "concerning [a] program for opioid addiction."[312]

### 2.7 Mission Peak Orthopaedics (Spine-and-Knee Injections) — Treating

The plaintiff had treatment for her spine and knees at Mission Peak from November 2014 to June 2016.[313] For her spine, she had a single round of bilateral-transforaminal-epidural steroid injections administered by Co Bahn, M.D., on December 12, 2014, and she was prescribed various medications.[314] She had a series of bilateral-cortisone injections administered to her legs by Ricardo Molina, M.D., from December 2014 to June 2016.[315] The next paragraphs provide more detail about this treatment.

In an initial consultation on November 18, 2014, with PA Victoria Tung, the plaintiff described her fall from her patio and the pain she experienced.[316] The pain was "sharp, burning []

---

[308] *Id.*

[309] *Id.*

[310] AR 757.

[311] *Id.*

[312] AR 754.

[313] AR 634–645, 675–712.

[314] AR 640.

[315] AR 702–706, 675, 677.

[316] AR 643.

and constant," and she had "numbness and weakness in her lower extremities."[317] On examination, there was "moderate tenderness to palpation of the lumbar spine[,]" "moderate pain on palpation of the bilateral lumbar paraspinal and bilateral gluteus musculature, left greater than right[,]" a "mild restriction of range of motion for all planes," the plaintiff's "straight leg raise [was] positive bilaterally," and her strength in her lower extremities was "4/5 on right dorsiflexion."[318] She could not "stand on [her] heels and toes due to pain in the lower extremities."[319] An MRI take of the plaintiff's lumbar spine on May 13, 2014 showed the following:

> [E]qual and suturing of the lumbar vertebrae. The L5-S1 disc is moderate to markedly narrowed with degenerative endplate changes and circumferential 3-mm to 5-mm disc bulge and osteophyte, greater in the midline. There is a 5% spinal canal stenosis and 25−50% bilateral recess and foraminal narrowing at L5-S1. Osteophytes contact both S1 nerve roots in the lateral recesses at L5-S1. At L4-4, there is 25% central canal stenosis, and 25% foraminal narrowing.[320]

The plaintiff elected "to proceed with bilateral L5-S1 transforaminal epidural steroid injections."[321] No medications were prescribed but she could "continue with Norco 10/325 [] and tramadol 50 mg [] as needed."[322] Dr. Banh administered the injections on December 12, 2014.[323]

On December 2, 2014, Dr. Molina had an initial consultation with the plaintiff for knee pain.[324] The plaintiff recounted her history (falling through a balcony floor and having knee surgery on May 11, 2011) and said she had "difficulty walking or standing for more than twenty minutes at time."[325] Her medications were "Norco, gabapentin and tramadol."[326] Both knees were

---

[317] Id.

[318] AR 644.

[319] Id.

[320] Id.

[321] Id.

[322] AR 645.

[323] AR 640.

[324] AR 641–42.

[325] AR 641.

[326] Id.

stable to varus and valgus stress, and she had a full range of motion.[327] There was "medial joint line tenderness[,] left great than right" in her lower-extremities and they were "[n]eurovascularly intact distally."[328] Dr. Molina concluded from bilateral X-rays that the plaintiff had "mild-to-moderate osteoarthritis" and "joint space narrowing" in both knees.[329] He recommended "bilateral knee cortisone injections" based on his "moderate degenerative findings" and administered the injections that day, noting that he would "see her back in 3 to 4 months."[330]

On January 7, 2015, the plaintiff saw PA Tung for a follow-up visit after receiving the injections on December 12, 2014.[331] The injections gave her "50–60% relief of her . . . lower extremity pain," and she had been able to decrease her use of Norco and tramadol.[332] The plaintiff said she took gabapentin with "no relief, and she had chest pressure and heart palpitations[.]"[333] Her bilateral lower extremity pain [] improved and she "no longer ha[d] lower extremity weakness or urinary incontinence."[334] An examination of her lumbar spine found:

> [M]inimal restriction in range-of-motion in all planes. There is minimal pain with flexion and extension, but no pain is elicited on palpation of the lumbar spine. There is mild pain on palpation of the bilateral lumbar paraspinal musculature. Straight-leg raise is positive bilaterally. Strength in bilateral lower extremities is full throughout. [The plaintiff] is able to momentarily stand on heels and toes, and she ambulates with an antalgic gait with the use of a cane.[335]

The plaintiff was to return in one month for another evaluation.[336]

---

[327] *Id.*

[328] *Id.*

[329] AR 641–42.

[330] AR 642.

[331] AR 634–36.

[332] AR 634.

[333] *Id.*

[334] *Id.*

[335] AR 635.

[336] AR 636

On February 13, 2015, in a follow-up visit, with PA Tung, the plaintiff reported falling backwards down a flight of stairs after a spell of dizziness.[337] "Her pain began to return to a moderate level (4-6/10) around the end of January 2015."[338] She had "severe difficulty standing."[339] PA Tung's findings from her examination were:

> [A s]evere restriction in range-of-motion in all planes [ ] as well as inability for lumbar extension. There is severe pain with flexion and extension with severe pain elicited in palpation of the bilateral lumbar paraspinal musculature. Straight-leg raise is positive bilaterally. Strength in bilateral lower extremities is full throughout. The [plaintiff] is unable to stand beyond one minute, and she ambulates with an antalgic gait with the use of a cane.[340]

X-rays of her lumbar spine "show[ed] slight anterolisthesis of L5 on S1[,]" "[d]egenerative changes [] throughout the lumbar spine[,]" and disc space narrowing at the L5-S1 disc space.[341] PA Tung recommended physical therapy and gait-training to strengthen the plaintiff's lower-bilateral extremities.[342] She prescribed the plaintiff 50 mg of tramadol, 120 tables of Norco, a Medrol Pak, and 25 tablets of cyclobenzaprine for lumbar strain and muscle tightness.[343]

On March 10, 2015, Dr. Molina found that the plaintiff's knees were stable to varus and valgus stress, and she had a full range of motion in her lower extremities without crepitus. [344] Dr. Molina administered another round of bilateral-steroid injections in the plaintiff's knees on the same day.[345]

On March 12, 2015, the plaintiff told PA Tung that her "her bilateral lower extremity pain extend[ed] down to her ankle, and [was] more severe on the right."[346] There was severe restriction

---

[337] AR 699.

[338] *Id.*

[339] AR 700.

[340] *Id.*

[341] *Id.*

[342] AR 701.

[343] *Id.*

[344] AR 698.

[345] AR 698, 706.

[346] AR 695.

in range-of-motion in all planes, as well as inability for lumbar extension.[347] There was severe pain in her lumbar spine on flexion, extension, and palpation.[348] PA Tung recommended physical therapy and a second round of epidurals, but the plaintiff declined the injections.[349] PA Tung prescribed her 50 mg of tramadol, 180 Norco pills, a Medrol Pak, 25 cyclobenzaprine pills, and 30 amitriptyline pills for sleep.[350]

On April 9, 2015, the plaintiff had a follow-up visit with PA Tung.[351] Her bilateral extremity pain at the time was "9–10/10 with no alleviating factors [and m]uscle spasms in her back [were] affecting her sleep."[352] PA Tung found a severe restriction in the range of motion in her back and strength throughout her bilateral extremities.[353] The plaintiff chose to not receive epidurals.[354] PA Tung strongly advised the plaintiff to begin physical therapy and prescribed her 50 mg of tramadol, 180 Norco pills, a Medrol Pak, 25 cyclobenzaprine pills for muscle spasms, and 30 amitriptyline pills.[355]

On May 21, 2015, the plaintiff reported to Dr. Molina that she had acute knee pain.[356] The plaintiff reported "difficulty sleeping because of the pain and difficulty standing or walking for more than 20 minutes."[357] He diagnosed her with moderate osteoarthritis and administered steroid injections to her knees that day.[358] He did not prescribe any medications.[359]

---

[347] AR 696.

[348] *Id.*

[349] AR 697.

[350] *Id.*

[351] AR 691.

[352] *Id.*

[353] AR 692.

[354] AR 693.

[355] *Id.*

[356] AR 689.

[357] *Id.*

[358] AR 689, 705.

[359] AR 689.

On June 2, 2015, the plaintiff saw Dr. Banh.[360] She "never started the Medrol Pak or amitriptyline prescribed to her because she actually discarded the medications."[361] Dr. Molina's cortisone injection gave her good relief.[362] She complained of persistent pain that radiated down her lower back to lower extremities.[363] It started "8/10" in the morning and improved to "6/10 after she move[d] around."[364] She "cut down her use of Norco to 4 times per day."[365] An examination of the plaintiff's spine showed the following:

> [M]oderate pain with lumbar flexion and extension. There is moderate pain on palpation of the bilateral lumbar paraspinal musculature, left greater than right. There is moderate pain on palpation of the right greater trochanter. Straight-leg raise is positive bilateral. Strength in the bilateral lower extremities is full throughout. The [plaintiff] ambulates with an antalgic gait and she is not using a cane today.[366]

Dr. Banh's diagnosis was "Lumbar spinal stenosis, Levoscoliosis of the lumbar spine, Lumbar radiculopathy, Gait abnormality and Lumbar strain."[367] He recommended that the plaintiff receive another round of epidurals and recommended physical therapy.[368] They had a "long discussion regarding the use of her narcotic pain medication" and he advised her to reduce her use of the medication.[369] He prescribed her 120 Norco pills and 60 Flexeril pills.[370]

---

[360] AR 686–688.

[361] AR 686.

[362] *Id.*

[363] *Id.*

[364] *Id.*

[365] *Id.*

[366] AR 687.

[367] *Id.*

[368] *Id.*

[369] *Id.*

[370] AR 688.

On August 5, 2015, the plaintiff denied pain her lower left extremity and told PA Tung that her "pain is worse in the morning at 8/10 and improved 6/10 with movement and activity."[371] The plaintiff's lumbar examination showed the following:

> [M]oderate pain with lumbar flexion and extension. There is moderate pain on palpation of the bilateral lumbar paraspinal musculature, left greater than right. There is no pain on palpation of the right greater trochanter. Straight-leg raise is negative bilaterally today. Strength in the bilateral lower extremities is full throughout. The [plaintiff] ambulates with an antalgic gait, and she is not using a cane today.[372]

PA Tung diagnosed the plaintiff with lumbar spinal stenosis, levoscoliosis of the lumbar spine, lumbar radiculopathy, gait abnormality, and a lumbar strain.[373] PA Tung recommended that the she receive another round of epidurals, but the plaintiff declined.[374] She prescribed the plaintiff 120 Norco pills and 60 Flexeril pills.[375]

The plaintiff received bilateral injections in her knees on September 17, 2015 and again on December 15, 2015.[376] In both appointments, the plaintiff reported "difficulty sleeping because of the pain and difficulty standing or walking for more than twenty min[utes.]"[377] Dr. Molina noted both times that she had "moderate bilateral knee osteoarthritis."[378]

On March 22, 2016 and June 21, 2016, the plaintiff saw Dr. Molina and reported that she had difficulty sleeping because of pain and difficulty standing or walking for more than 20 minutes.[379] She was experiencing acute knee pain (worse in her left knee) and some locking and popping in

---

[371] AR 687.

[372] AR 684.

[373] Id.

[374] Id.

[375] AR 685.

[376] AR 679, 681, 704.

[377] Id.

[378] Id.

[379] AR 675, 677.

her left knee.[380] On both occasions, Dr. Molina recommended an MRI to rule out meniscal tears and repeated the steroid injections in her knees.[381]

### 2.8 Eden Medical Center — Treating

The plaintiff visited the emergency room at Eden Medical Center multiple times between January 2014 and November 2016.[382]

On January 19, 2014, the plaintiff complained of leg pain and was treated by Jonathan Scott McWhorter, M.D..[383] She felt like she had a foreign body in her left foot.[384] Dr. McWhorter found her to be a good historian.[385] She "ran out of [] Vicodin and [did not] have an appointment with [her] PMD for another few weeks."[386] She was negative for back pain, joint swelling, and leg swelling and positive for arthralgia.[387] The range of motion in her knee was "90 degrees with minimal pain."[388] He noted that the plaintiff was prescribed "~260 pills of Norco/Vicodin" since the "beginning of December" and advised checking again if the plaintiff requested prescriptions in the future.[389] He diagnosed her with "chronic pain, osteoarthritis[, and] drug seeking behavior" and prescribed Norco and ibuprofen.[390]

On January 28, 2014, the plaintiff presented with left knee pain and was treated by PA David King.[391] Her left knee had moderate tenderness and normal strength and muscle tone.[392] She was

---

[380] *Id.*

[381] AR 675, 677, 703.

[382] AR 501–526, 804–902.

[383] AR 504.

[384] *Id.*

[385] *Id.*

[386] *Id.*

[387] AR 505–06.

[388] AR 506.

[389] AR 507.

[390] *Id.*

[391] AR 514.

[392] AR 516.

oriented to time and place and had a normal mood and affect.[393] He administered Zofran and hydromorphone and prescribed her 20 Norco pills.[394]

On April 21, 2014, the plaintiff reported consistent dull non-radiating pain in her right leg after "falling out of a second story last year" and requested a refill of her pain medication because her treating physician was out of town.[395] Amy Grubert, M.D., stated that the plaintiff "appeared well" and found "no swelling over the right leg."[396] She diagnosed the plaintiff with right-leg pain and discharged her with prescriptions of hydrocodone/acetaminophen and Norco.[397] Dr. Grubert noted that "[p]otential duplicate medications [were] found."[398]

On September 12, 2015, the plaintiff returned for a refill of Norco.[399] PA Daoud Hamidi conducted a head-to-toe examination and "no injuries were found."[400] The plaintiff's alignment was good and there was no "significant evidence [of an injury] that would require immediate surgical intervention."[401] "[O]ccult fractures, ligament injury, tendon injury, [and] cartilage injury [had] been considered and [could not] be completely excluded."[402] He diagnosed her with "Pain of the lower extremity…and abrasion, foot."[403] He prescribed 15 Norco pills.[404]

On March 6, 2016, the plaintiff saw Benjamin Meeks, M.D., for chronic bilateral-knee and lower-back pain.[405] Dr. Meeks found "diffuse tenderness to palpation in both knees" with no

---

[393] *Id.*

[394] AR 516−517.

[395] AR 521.

[396] AR 523.

[397] *Id.*

[398] *Id.*

[399] AR 809.

[400] AR 811.

[401] *Id.*

[402] *Id.*

[403] AR 812.

[404] *Id.*

[405] AR 837.

swelling, a good range of motion, and normal muscle tone.[406] The plaintiff's sensation was intact, her "motor [was] 5 out of 5 to heel and toe raise," and she had a "slight decreased range of motion due to secondary pain."[407] She was alert and oriented to place and time, and she had a normal mood and affect.[408] Dr. Meeks reviewed the plaintiff's CURES history and found that she received other prescriptions for narcotic medications from other providers, in addition to the 120 to 180 tablets of Norco and Percocet a month she received from PA Deivert.[409] He diagnosed her with "Bilateral low back pain without sciatica [and] Chronic pain of both knees."[410] He prescribed 20 tablets of Norco.[411]

On November 9, 2016, the plaintiff reported "sharp, severe, constant, non-radiating" dental pain.[412] She denied a new injury or a change in back pain.[413] She took ibuprofen with "minimal relief" and hydrocodone with "good relief."[414] The plaintiff said she was a sales coordinator and had two children.[415] PA King diagnosed her with "Pain due to dental caries [and] Elevated blood pressure."[416] PA King noted that the plaintiff was seen "multiple times in the past for pain related complaints" and her CURES report showed "multiple narcotic pain medication prescriptions of hydrocodone . . . in quantities of 180 every month [and] also multiple opiate prescriptions from different providers."[417] Her record contained a pop-up note saying that she was "obtaining

---

[406] AR 840.

[407] Id.

[408] Id.

[409] AR 843.

[410] AR 841.

[411] Id.

[412] AR 732, 871.

[413] Id.

[414] Id.

[415] Id.

[416] AR 875

[417] AR 874–875.

controlled substances from different providers."[418] The plaintiff told PA King that she did not pick up her most recent Norco prescription.[419] She "show[ed] no clinical signs of opiate toxicity or withdrawal."[420] PA King advised her that she would be given a prescription for pain medication that day, but "in the future[,] she [would] not receive a prescription from the ED for opiate pain medication (unless for acute injury or condition such as fracture) given prior frequent pain medications [and] that she need[ed] to obtain future prescriptions for narcotic pain meds from a single medical provider."[421] He dispensed her 8 Norco pills and 40 penicillin pills.[422] She was also "[a]dvised not to drive or operate heavy machinery while taking medication."[423] [The plaintiff] verbalized understanding of this plan and agreed."[424] She said that she would "take the bus home because her ride cancelled."[425]

### 2.9    Darien Behravan, M.O. — Examining

On July 28, 2016, Dr. Behravan, a workers' compensation doctor, examined the plaintiff for a shoulder injury that occurred on October 1, 2015 and an ankle injury on November 16, 2015.[426] The plaintiff told him that she had sustained an injury to her right shoulder while working as a front-desk associate at a Holiday Inn Express.[427] She "hit her shoulder against an open door while

---

[418] AR 875.

[419] Id.

[420] Id.

[421] Id.

[422] Id.

[423] AR 876.

[424] Id.

[425] Id.

[426] AR 743.

[427] Id.

she was walking out."[428] She did not see anyone for the injury, just her primary-medical

doctor."[429] "[T]he pain was tingling and constant" in her shoulder during the examination.[430]

Dr. Behravan found the following in an examination of the plaintiff's right shoulder:

> Movements are painful with flexion beyond 170 degrees and abduction beyond 160 degrees. Neer, Hawkins, Empty Cans and shoulder crossover tests are negative. Belly press, Lift of tosses and Jobe tests are negative ruling out pathology of the glenoidal labrum. Apprehension test, anterior press test, posterior stress test and Jobe relocation test are negative ruling out any joint instability. Drop arm test is negative.[431]

Her right shoulder maneuvers were also "positive for AC joint crepitus and [her] spencer

maneuvers [were] restricted."[432] For her right elbow, he found that valgus and varus stress tests

were negative and "tenderness to palpation [was] noted over the lateral epicondyle."[433] He

diagnosed the plaintiff with "pain in right shoulder," "other sprain of right shoulder," and "other

bursitis of elbow."[434] He also found that she had various postural deficiencies.[435]

Dr. Behravan examined X-rays and MRI's of the plaintiff's knees, chest, and back from 2010,

2011 and 2012.[436] X-rays of her knees from 2012 showed "osteoarthritis of the right patellar

femoral joint, [and] mild degenerative changes of the medial compartments."[437] An MRI of her

right knee from 2011 showed "slight blunting of the medial meniscal edge, mild chronic

chondromalacia patella[,] and bursitis in the right knee."[438] An MRI of her spine from 2010

showed an "annular disc bulge with left paracentral protrusion and peripheral annular fissure at

---

[428] *Id.*

[429] *Id.*

[430] *Id.*

[431] AR 745.

[432] *Id.*

[433] *Id.*

[434] *Id.*

[435] *Id.*

[436] *Id.*

[437] *Id.*

[438] *Id.*

L5–S1, resulting in moderate narrowing of the central canal and bilateral foramina; an extension of disc into left S1 lateral recess with abutment of the descending left S1 nerve root; another bulge with focal central protrusion at L4–5 resulting in moderate narrowing of the central canal and mild to moderate bilateral foraminal encroachment; and [an] annular bulge with focal central protrusions and hypertrophy of the ligament flavum at L3–4, resulting in mild moderate narrowing of the central canal and mild bilateral neural foraminal stenosis."[439]

Dr. Behravan recommended that the plaintiff "continue with work restrictions of no pushing, pulling or lifting over 15 pounds with the right hand and no lifting above shoulder level with the right hand more than 1/3 of the shift[,]" attend "an aggressive course of physical therapy…dedicated to the right shoulder and elbow[,]" lose weight, and if the pain continued, receive "stem cell therapy or PRP injection into the right shoulder."[440]

### 2.10 Kim Goldman, Psy.D. — Examining

On February 18, 2015, Kim Goldman, Psy.D., performed a psychological evaluation on the plaintiff, using the Wechsler Adult intelligence Scale IV and the Wechsler Memory Scale IV, in Hayward, California.[441]

The plaintiff "was driven to the appointment by a friend."[442] She was identified by her driver's license.[443]

"She independently completed a preprinted five-page history form."[444]

> [S]he was born in the Fiji Islands and came to the United States 30 years ago. She had been married once and was widowed five years ago. She has two children, ages 7 and 20. She lives with her children in an apartment. Her source of income is general assistance and food stamps. Her older child is employed as a security guard.[445]

---

[439] AR 746.

[440] AR 746–47.

[441] AR 671–74.

[442] AR 671.

[443] *Id.*

[444] *Id.*

[445] AR 671–72.

The plaintiff complained that she was "very depressed, emotional," "had black outs" "[the] desire to sleep a lot[,]" and "[was] unable to sleep at night."[446] She began to experience the symptoms "after she injured herself in a fall from a second-floor window."[447]

The plaintiff's educational and vocational history were as follows:

> [The plaintiff] is a high school graduate. She was never in special education classes in high school. She received a B grade average. She holds an associate's degree in hotel hospitality. She worked at a hotel in customer service. The longest time she stayed at one job was over the course of 15 years on a full-time basis in hotel customer service. The job ended eight years ago. "My husband was sick. I quit. I was taking care of him." She has not worked since reportedly due to depression.[448]

The plaintiff described her daily functioning.[449] She "stopped driving 2–3 years" before.[450] She was "able to shower, bathe, groom, and dress herself without help" and could "pay bills and keep track of money without help from other people."[451] The plaintiff said that she could not do much with her current condition: "I can't move[;] I like to sit in the sun."[452] She "was prescribed an unknown type of psychotropic mediation by a provider through Hayward Family Care reportedly due to depression…[which] helps [her] get things done in the absence of negative side effect."[453]

Dr. Goldman found that the plaintiff "presented as a questionable historian."[454] The plaintiff was "pleasant, but only superficially[,] and cooperative throughout the evaluation."[455] She followed instructions without the need for clarification or repetition but "did not make an adequate effort on the tasks presented to her."[456] She was coherent, the rate of her speech was normal, her

---

[446] AR 671.

[447] Id.

[448] AR 672.

[449] Id.

[450] Id.

[451] Id.

[452] Id.

[453] Id.

[454] AR 671.

[455] AR 672.

[456] AR 673.

verbalizations were clear and 100% intelligible, and she was alert and aware.[457] Dr. Goldman canceled the evaluation because, although the plaintiff paid attention to instructions, "she appeared to make a volitional effort to simulate cognitive impairment."[458] Thus, although she found that the plaintiff had several disorders, Dr. Goldman deferred her testing because of "malingering."[459]

### 2.11  Disability Determination Explanation

During the administrative process, non-examining doctors generated two disability determination explanations ("DDE"), one related to the plaintiff's initial application and one at the reconsideration level.

At the initial level, Tawnya Brode, Psy.D., analyzed the plaintiff's mental-health records and concluded that the plaintiff had an affective disorder rated as severe, but that this impairment did not "precisely satisfy the diagnostic criteria of 12.04."[460] She noted that there was evidence that the plaintiff was "depressed and [had] some difficulties regard[ing] memory and concentration."[461]

The plaintiff did not provide sufficient evidence for the 'B' or 'C' criteria of the listings.[462] She also failed to put forward sufficient medical or opinion evidence to evaluate her residual functional capacity ("RFC") and thus was determined "not disabled."[463]

On reconsideration, Kim Morris, Psy.D., found that there was insufficient evidence to substantiate "organic mental disorders" and an impairment was present that did not precisely satisfy the diagnostic criteria for "affective disorders" in the 'A' criteria listings.[464] There was also insufficient evidence to establish 'B' or 'C' criteria listings.[465]

---

[457] *Id.*

[458] *Id.*

[459] AR 674.

[460] AR 61.

[461] *Id.*

[462] *Id.*

[463] AR 62.

[464] AR 73

[465] *Id.*

Linda Pancho, M.D., assessed the plaintiff's RFC.[466] She found that the plaintiff could do the following: occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk six hours out of an eight-hour work day push or pull an unlimited amount; and climb ramps/stairs, climb ladders/ropes/scaffolds, and balance, stoop, kneel, crouch, or crawl only occasionally.[467] She found that the plaintiff did not have any manipulative, visual, communicative or environmental limitations.[468] The plaintiff was determined not disabled.[469]

### 3. Administrative Hearing

#### 3.1 The plaintiff's testimony

On February 1, 2017, the plaintiff testified at a hearing before the ALJ.[470] The ALJ examined the plaintiff first.

The ALJ asked the plaintiff whether she was working, and if so, whether it was full or part-time.[471] The plaintiff was working part-time, making $1,000 a month.[472] She took pain medication for her knees and back.[473] When asked about reported self-employment income in 2015, the plaintiff said that she was part of a trucking company in 2015, but she "never saw that money, [she] was just added on the business."[474] It was her husband's business, but he died and she could not operate it herself because of her health.[475]

---

[466] AR 74–76

[467] AR 74−75.

[468] AR 75.

[469] AR 76.

[470] AR 38–53.

[471] AR 43.

[472] AR 45.

[473] AR 44.

[474] *Id*.

[475] AR 44–45.

The plaintiff worked twenty-five to thirty hours a week in a hotel as a PBX operator (one who routes incoming calls to the correct department of a business).[476] The plaintiff's jobs the year before were the same, but she could not manage them full time because standing was difficult for her due to her sore knee "all the time."[477] When asked whether she could sit and whether sitting caused her trouble, the plaintiff responded "[w]ell, I could sit for a little bit and then I have to get up because I have a back issue as well."[478]

The plaintiff's attorney examined her next. The plaintiff "made about $1000 a month."[479] Her knee pain was worse than her back.[480] She worked at the front desk, usually for eight hours a day, and had to stand three to four times a day and "they let [her] sit and… move around."[481] Her pain level was the worst when she got home from work and that is when she needed "to take a pain pill."[482] After she took the pain pill, her pain level was "about five to six."[483] The plaintiff did not take her pain medication at work because it would make her fall asleep.[484] Sometimes her pain worsened throughout the work day.[485]

The plaintiff used a cane to climb the stairs at work and at home and wore knee braces (prescribed by a doctor) all the time.[486] When asked whether she saw a doctor, and if so, whether the doctor knew that she had returned to work, the plaintiff replied that she had "a very good doctor" who was "very concerned about [her] working."[487] The plaintiff stopped working in April

---

[476] AR 45.

[477] AR 45−46.

[478] AR 46.

[479] *Id.*

[480] AR 48.

[481] AR 48–49.

[482] AR 49.

[483] *Id.*

[484] *Id.*

[485] AR 50.

[486] *Id.*

[487] AR 50–51.

2011.[488] In response to a question about whether her pain caused her difficulty focusing, the plaintiff responded that "[her] pain gets so bad that [she] has to crawl on the floor sometimes."[489] The onset of her disability was May 3, 2011, when she had her knee arthroscopy.[490]

### 3.2 Vocational Expert Testimony

The VE classified the plaintiff's work from 1993 to 2011 as "a hotel clerk."[491] When ALJ asked the VE to characterize "the hotel work in vocational terms," the VE said that the "DOT code [is] 238.367-038, exertion level is light, and SVP is 4."[492] The VE said that the plaintiff's other job was "a PBX or a telephone switchboard operator…DOT code 235.662, exertion level [] sedentary and the SVP is 3."[493] He testified that some but not all PBX or telephone switchboard operators are permitted to sit and stand at will, "especially if they have headsets."[494]

### 3.3 Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine if the plaintiff was disabled and concluded that she was not.[495]

At step one, the ALJ found that the plaintiff "did not engage in work activity commensurate with substantial gainful activity from April 2011 until November 2016."[496]

At step two, the ALJ determined that the plaintiff had the following severe impairments: "osteoarthritis of the knees, morbid obesity, opioid dependence, degenerative disc disease, and affective disorders with diagnoses including depression."[497]

---

[488] AR 51.

[489] Id.

[490] AR 52–53.

[491] AR 54.

[492] Id.

[493] Id.

[494] Id.

[495] AR 15–29.

[496] AR 19.

[497] Id.

The plaintiff "initially alleged the severe impairments of traumatic brain injury, a damaged right leg, and arthritis of the knee, a back injury, depression, chronic severe headaches, fatigue and insomnia" and "later alleged [] bilateral knee osteoarthritis, lumbar degenerative disc disease, anxiety and depression."[498] Regarding these alleged impairments the ALJ held:

> Pain, fatigue and insomnia are signs of symptoms, not medically determinable impairments. Lumbago and sciatica are Latin words for different types of pain. Traumatic brain injury, chronic severe headaches, and a damaged right knee are not established as medically determinable impairments in this case. Nevertheless, neither those conditions nor medically determinable impairments including hyperlipidemia, hypertension, history of gastric bypass in 2004, dental caries, are not severe impairments because there is no probative evidence that limitations from these impairments lasted more than twelve months, or there is simply no evidence that they more than minimally affect the claimant's ability to perform basic work functions.[499]

The ALJ found that obesity was a severe impairment "when combined with the musculoskeletal impairments."[500]

The ALJ stated the following of substance abuse:

> With or without substance use during the relevant period, the record does not support a finding of a more reduced residual functional capacity than assessed herein for any twelve-month period or of disability as defined by the Social Security Act; accordingly, a substance dependence disorder is not found to be a factor material to a determination of disability in this case.[501]

At step three, the ALJ held that none of the plaintiff's impairments or combination thereof met or medically equaled the severity of those listed in "C.F.R. Part 404, Subpart P, Appendix 1 for the requisite period (20 C.F.R. § 404.1520(d), 404.1526)."[502]

The ALJ found that the plaintiff did not meet the requirements of Listing Section 1.03 because of the following:

---

[498] AR 20.

[499] *Id.*

[500] AR 19.

[501] *Id.*

[502] AR 20.

The evidence must show reconstructive surgery or surgical arthrodesis of a major weight-bearing joint with an inability to ambulate effectively, and a return to effective ambulation did not occur or is not expected to occur within twelve months of onset. The claimant is not unable to ambulate effectively within the meaning of the regulation, and her condition does not meet or equal the criteria of Section 1.03.[503]

The ALJ ruled that plaintiff's spinal impairment did not meet the criteria of Listing Section 1.04 for the following reason:

[A] disorder of the spine must be corroborated by medically acceptable clinical and imaging studies supporting evidence of compromise of a nerve root (including cauda equina) or the spinal cord with: evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or spinal arachnoiditis, confirmed by an operative not or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more that once every two hours; or lumbar spinal stenosis resulting in pseudo-claudication, established by findings on appropriate medically acceptable imaging, manifested by chronic non-radicular pain and weakness, and resulting in inability to ambulate effective, as defined in 1.00B2b. The medical evidence of record does not support a finding that the claimant's spinal impairment meets or equals the criteria of Listing Section 1.04.[504]

The ALJ held that the plaintiff's mental impairment did not meet or equal the severity required in Listing Section 12.04 or any section.[505]

To satisfy the criteria in "paragraph B," the plaintiff's mental impairment had to result in at least one extreme or two marked limitations in the following areas of functioning:

Understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.[506]

---

[503] *Id.*

[504] AR 20–21.

[505] AR 21.

[506] *Id.*

The ALJ found that in "understanding, remembering, or applying information, [the plaintiff] had mild to moderate limitations[,]" that "[i]n interacting with others, the [plaintiff] has had no to mild limitations[,]" and that "[w]ith regard to concentrating, persisting, or maintaining pace, [the plaintiff] has had mild to moderate limitations."[507] The ALJ held that the plaintiff did not satisfy the "paragraph B" criteria because her mental impairment "did not cause at least two 'marked' limitations or one 'extreme' limitation."[508]

He also said that he had considered whether the "paragraph C" criteria were satisfied but determined that they were not because the plaintiff had not submitted the requisite evidence to make such a determination.[509]

Before step four, the ALJ determined that the plaintiff "had the residual functional capacity to perform the full range of sedentary work, as defined in 20 C.F.R. § 404.1567(a), and [was] able to perform simple routine tasks equating to unskilled work."[510] He considered "all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence[.]"[511] He "considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p."[512]

The ALJ determined that the plaintiff's medically determinable impairments could reasonably cause the alleged symptoms and that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not consistent with the medical evidence in the record.[513]

He said the following about the plaintiff's statements concerning her impairments:

> The claimant has denied significant side effects from her numerous prescribed medications. Although, as noted above, there is evidence of some adverse side-

---

[507] *Id.*

[508] AR 22.

[509] *Id.* According to the ALJ, such "paragraph C" evidence could consist of evidence of "mental health therapy, psychological support, or need for an ongoing, highly structured setting to diminish symptoms or signs of a mental disorder."

[510] *Id.*

[511] *Id.*

[512] *Id.*

[513] AR 23–28.

effects, there is no probative evidence to support a finding of a more reduced residual functional capacity for any twelve-month period on that basis. She alleged she was very emotional and experienced blackouts. As discussed above the claimant testified at the February 2017 hearing that she was working part-time as a telephone switching system operator at a hotel. She said she previously had returned to work in 2015 but had stopped. She explained that she was working to take care of her child, but that she experienced pain in her knee and back while working. The claimant said that she still takes pain medication for her back and knee. She testified that her knee was worse than her back. She alleged that she used a cane at work and at home.[514]

Then, the ALJ explained that the objective diagnostic tests and imaging did not support a finding of disability.[515] They showed "no impairments to mild abnormalities [] consistent with the plaintiff's complaints" until imaging of the plaintiff's knees and spine in 2014.[516] Imaging of her spine showed "no significant protrusions, central canal or neural foraminal narrowing" in 2010, mild degenerative disc disease in 2013, and disc extrusions causing spinal stenosis in 2014.[517] Imaging of her knees showed abnormalities in her right knee leading to arthroscopy in 2011, moderate osteoarthritis in both knees in 2012, and degenerative changes, osteophytes, and joint space narrowing in her right knee in 2013.[518] In 2014, the plaintiff's spine and knee impairments "were at least partially successfully treated with cortisone injections and transforaminal steroid injections."[519]

The ALJ next said that "[a] preponderance of the objective medical evidence [did] not support a more restrictive functional capacity," but "[b]ased on the record as a whole…. the claimant is found limited to sedentary work."[520] The evidence suggested "an addiction to opioid medications" but "a substance use disorder is not a factor material to a determination of disability in this case

---

[514] AR 23.

[515] *Id.*

[516] *Id.*

[517] *Id.*

[518] *Id.*

[519] *Id.*

[520] *Id.*

because the above residual functional capacity finding [was] supported with or without substance abuse during the relevant period."[521]

The ALJ described the records of the plaintiff's different medical providers about her physical impairments. [522] He accorded reduced weight to the opinion of the State's medical consultant, Dr. Pancho, because she "did not give enough consideration to the limitations due to [the plaintiff's] combined obesity and knee arthritis."[523] The ALJ afforded weight to Dr. Behravan's opinion "only to the extent consistent with [the ALJ's] findings" because there was no "probative medical evidence to support the right arm limitations [described by Dr. Behravan] for a continuous period of twelve months."[524] He also gave little weight to PA Deivert because her opinion was "not consistent with the record as a whole, including the [plaintiff's] work activity or the medical evidence."[525]

The ALJ also summarized records about the plaintiff's psychological impairments. He found "the medical evidence suggested some episodes of depression with short periods of prescribed psychotropic medication, but no psychiatric hospitalizations, no significant ongoing treatment with a psychiatrist or psychologist, and no treatment with a counselor or therapist."[526] The plaintiff did not return functional reports for a psychologist she consulted in 2015 despite repeated attempts to obtain them from her.[527] After reviewing the evaluating psychologists' assessments, "the record reasonably can be interpreted as showing no severe mental impairment."[528] "[B]ased on the record as whole, considering non-physical limitations, complaints of significant depression and some

---

[521] AR 24.

[522] AR 24–27.

[523] AR 26.

[524] AR 27.

[525] *Id.*

[526] *Id.*

[527] *Id.*

[528] AR 28.

reported concentration limitations due to pain or medication side-effects…[the plaintiff is] reasonably limited to simple routine tasks equating to unskilled work."[529]

At step four, the ALJ held that based on his assessment of the plaintiff's residual functional capacity, the plaintiff's prior work as a hotel clerk and PBX operator were precluded because her work as a hotel clerk was "light, semi-skilled work with and SVP of 4" and her work as a PBX was "sedentary, semi-skilled with and SVP of 4."[530]

At step five, the ALJ found that the plaintiff had the ability to perform work at the full sedentary exertional level but was compromised by a non-exertional limitation.[531] He stated that "[i]f the claimant has solely non-exertional limitations, Section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15)."[532] The ALJ ruled that this non-exertional limitation had "no effect on the occupational base of unskilled work at the sedentary exertional levels."[533] The ALJ therefore held:

> A finding of "not disabled" is therefore appropriate under the framework of Medical-Vocational Rule 201.28 and Section 204.00 in the Medical-Vocational Guidelines, which take administrative notice on of unskilled jobs. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis (SSR 81-15). Thus, even with a limitation to simple routine tasks equating to unskilled work, the claimant has not been precluded from performing jobs existing in significant numbers in the economy.[534]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

---

[529] Id.

[530] Id.

[531] AR 28–29.

[532] AR 29.

[533] Id.

[534] Id.

are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that. . . [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is

entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986). At step five, the burden shifts to the Commissioner. *Id*.

## ANALYSIS

The plaintiff contends that the ALJ erred by (1) improperly rejecting the opinions of her treating and examining doctors and her treating physician's assistant, (2) rejecting her testimony, and (3) failing to base his step-five finding on substantial evidence. For the reasons below, the court grants the plaintiff's motion for summary judgment, denies the Commissioner's motion for summary judgment, and remands for further proceedings consistent with this order.

## 1. Whether the ALJ Improperly Weighed Medical-Opinion Evidence

The plaintiff argues that the ALJ erred by (1) affording no weight to the limitations Dr. Behravan found for the plaintiff's right arm, (2) failing to address Dr. Bhandari's letter stating that the plaintiff's cocktail of medications made her forgetful, and (3) giving little weight to PA Deivert's opinion.[535] The ALJ erred in weighing this evidence.

---

[535] Mot. – ECF No. 18 at 10–12; *see also* Reply – ECF No. 20 at 1–4.

### 1.1 Legal Standard

The ALJ is responsible for "'resolving conflicts in medical testimony and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).[536] Social Security regulations distinguish between three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ, may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will require only that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see Garrison*, 759 F.3d at 1012 ("If a treating or

---

[536] The Social Security Administration promulgated new regulations, including a new § 404.1521, effective March 27, 2017. The previous version, effective to March 26, 2017, applies based on the date of the ALJ's hearing, February 1, 2017.

examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted). "The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

An ALJ errs when he "rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for [his] conclusion." *Garrison*, 759 F.3d at 1012–13. "[F]actors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Orn*, 495 F.3d at 631. (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (an ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

The ALJ also must consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." 20 C.F.R. § 404.1527(f). The ALJ is required to consider observations by "other sources" as to how an impairment affects a claimant's ability to work. *Id.* Nonetheless, an "ALJ may discount [the] testimony" or an opinion "from these other sources if the ALJ gives . . . germane [reasons] for doing so." *Molina*, 674 F.3d at 1111 (internal quotations and citations omitted). "[A]n opinion from a medical source who is not an acceptable medical source. . . may outweigh the medical opinion of an acceptable medical source[.]" 20 C.F.R. § 404.1527(f)(1). "For example, it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." *Id.*

### 1.2 Dr. Behravan

Dr. Behravan, a workers' compensation doctor, examined the plaintiff on July 28, 2016, for injuries that she suffered to her right shoulder (October 1, 2015) and right ankle (November 16, 2015).[537] He recommended aggressive physical therapy and stem-cell therapy or injections for the shoulder if pain continued, and opined that she should continue with work restrictions of no pushing, pulling, or lifting more than 15 pounds and no lifting above shoulder level for more than one third of her work shift.[538] Because Dr. Behravan is an examining medical source and his opinion is uncontradicted, the ALJ was required to give clear and convincing reasons supported by substantial evidence to reject his opinion. *Ryan*, 528 F.3d at 1198. The ALJ did not satisfy this burden.

The ALJ accorded weight to Dr. Behravan's opinion mentioning the arm limitations, but noted that there was no probative evidence to support the right-arm limitations at that time or for a continuous period of twelve months.[539] Unless an "impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R § 404.1509. This is known as the "duration requirement." *Id*. It is true that Dr. Behravan did not state that he expected the arm limitation to last a year.[540] But it is not unsurprising that a workers' compensation doctor speaks only to the injury in front of him and not an SSI-disability duration requirement that was not before him.

At a physical examination at Eden Medical Center on March 6, 2016, the plaintiff exhibited a "normal range of motion" and did not complain of any soreness in her right upper extremity.[541] But that examination was for the plaintiff's knee and lower-back.[542] She still complained of shoulder pain, and the medical records show complaints of shoulder pain, at least through

---

[537] AR 743.

[538] AR 746–747.

[539] AR 27.

[540] AR 747; Cross Mot. – ECF No. 19 at 7.

[541] AR 837–40.

[542] AR 837.

November 2016.[543] Thus, the ALJ erred because the reason he provided for rejecting Dr. Behravan's opinion was not supported by substantial evidence in the record.

### 1.3 Dr. Bhandari

Dr. Bhandari treated the plaintiff from May 5, 2011 to January 15, 2014 and his opinions are not contradicted.[544] Thus, the ALJ must state clear and convincing reasons supported by substantial evidence to disregard his opinion. *See Alcala v. Colvin*, SACV 12–0626 AJWW, 2013 WL 1620352, at *5 (C.D. Cal. Apr. 15, 2013) (citing *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). On February 28, 2012, Dr. Bhandari opined that the plaintiff's cocktail of medications caused forgetfulness.[545] The plaintiff claims that the ALJ did not mention this opinion in his decision and gave no reasons for rejecting it.[546]

But the ALJ did address Dr. Bhandari's letter, noting that the plaintiff had mild to moderate limitations in "understanding, remembering and applying information" (in his determination for the "paragraph B" criteria).[547] He stated "[a] doctor wrote in February 2012 that the claimant was on medications that cause her to be forgetful; she does take narcotic medications daily."[548] The ALJ factored in the findings from the letter in later parts of his decision. In assessing the plaintiff's RFC, the ALJ found that "there is evidence of some adverse side-effects" from those medications.[549] He determined that the plaintiff had non-exertional limitations that compromised her ability to function at the full sedentary level:

> [B]ased on the record, considering non-physical limitations, complaints of significant depression and some reported concentration limitations due to pain

---

[543] AR 754.

[544] AR 399–500.

[545] AR 497.

[546] Mot. – ECF No. 18 at 11; Reply – ECF No. 20 at 3–4.

[547] AR 21.

[548] *Id*.

[549] AR 23.

medication side-effects, I find the claimant reasonably limited to simple routine tasks equating to unskilled work.[550]

The ALJ thus addressed the Dr. Bhandari's letter and gave it weight. This is not a ground for remand.

### 1.4 PA Deivert

 PA Deivert qualifies as an "other source." *Molina*, 674 F.3d at 1111. She opined that the plaintiff was unable to work as of November 14, 2015 and treated the plaintiff for knee pain, back pain and fatigue from May 2014 to November 2016.[551] The ALJ referenced only her note from 2016 that the plaintiff had been unable to work beginning November 2015.[552] The ALJ gave little weight to her opinion: "I give little weight to the physician assistant's opinion because it is not consistent with the record as a whole, including the claimant's work activity or the medical evidence."[553] But as the plaintiff contends, PA Deivert treated her, and her opinion was not inconsistent with the record, which shows ongoing treatment for knee and back pain and fatigue.[554]

First, in the Ninth Circuit, "[c]ontradictory medical evidence is not a germane reason to reject lay witness testimony." *Burns v. Berryhill*, 731 Fed. App'x 609, 613 (9th Cir. 2018) (citing *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017)).

Second, PA Deivert's opinion should be given additional weight as a treating source. *See* 20 C.F.R. § 404.1527(f)(1). In *Olmstead v. Colvin*, the court held that an ALJ's failure to provide germane reasons for discounting a nurse practitioner's opinion was "especially egregious where the nurse practitioner saw Plaintiff on several occasions and her records make direct references to Plaintiff's limitations and ability to work." No. 15-cv-02656-NJV, 2016 WL 3611881, at *4 (N.D. Cal. July 6, 2016). Here, PA Deivert saw the plaintiff at least 13 times from May 2014 to

---

[550] AR 28.

[551] AR 574–633, 713–803.

[552] AR 27.

[553] *Id.*

[554] Mot. – ECF No. 18 at 11; Reply – ECF No. 20 at 3.

November 2016.[555] The ALJ held that PA Deivert's opinion was "not consistent with the record as whole, including the claimant's work activity or the medical evidence."[556] He did not explain specifically what parts of PA Deivert's opinion were inconsistent with the record or how they were inconsistent. This is insufficient.

## 2. Whether the ALJ Improperly Rejected the Plaintiff's Testimony

The plaintiff argues that the ALJ erred by rejecting the plaintiff's testimony and failed to identify which parts of the plaintiff's testimony, if any, were inconsistent with the medical record or otherwise not credible."[557] The court agrees.

The ALJ found the following about the plaintiff's testimony:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could possibly cause the type of alleged symptoms or limitations. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not found consistent with the medical evidence and other evidence in the record to the extent inconsistent wit this finding for the reasons explained in this decision.[558]

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether [the claimant has presented] 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Vasquez*, 572 F.3d at 591). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted).

"At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors

---

[555] AR 581, 588, 590, 594, 596, 615, 720, 762, 771, 773, 774, 784, 794.

[556] AR 27.

[557] Mot. – ECF No. 18 at 12–13; *see also* Reply – ECF No. 20 at 4–5.

[558] AR 23.

that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal punctuation omitted). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL 7369300, at *12 (N.D. Cal. Dec. 20, 2016).

Because the ALJ discredited the plaintiff's testimony in part on his assessment of the medical-opinion evidence, including Dr. Behravan's medical opinion, the court remands on this ground too. The ALJ can reassess the plaintiff's credibility in context of the entire record.

### 3. Whether the ALJ's Step-Five Determination Is Supported by Substantial Evidence

The plaintiff argues that the ALJ's findings at step five were not supported by substantial evidence.[559] The ALJ called the VE at the hearing and did not ask any hypotheticals about the plaintiff's ability to perform work. The ALJ found that the plaintiff "had the residual functional capacity to perform the full range of sedentary work, as defined in 20 C.F.R. § 404.1567(a), and [was] able to perform simple routine tasks equating to unskilled work."[560]

At step five the ALJ determined "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed."[561]

Because the court remands for a reweighing of medical-opinion evidence and the plaintiff's testimony, and because the RFC and non-exertional limitation determinations were based on those assessments, the court remands on this ground.

---

[559] Mot. – ECF No. 28 at 14–15; Reply–ECF No. 20 at 5–6.
[560] AR 22.
[561] AR 28.

### 4. Whether the Court Should Remand for Further Proceedings or Determination of Benefits

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*, 80 F.3d at 1292); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court.") (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). Generally, "'[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)) (alteration in original); *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."); *McCartey*, 298 F.3d at 1076 (remand for award of benefits is discretionary); *McAllister*, 888 F.2d at 603 (remand for award of benefits is discretionary); *Connett*, 340 F.3d at 876 (finding that a reviewing court has "some flexibility" in deciding whether to remand).

For the reasons described above, the court finds that remand is appropriate so as to "remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d at 635 (alteration in original)).

### CONCLUSION

The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: August 30, 2019

_____
LAUREL BEELER
United States Magistrate Judge